IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| REGINALD JONES (#R50007), )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>ALEX JONES, Warden, Menard Correctional )<br>Center, and ATTORNEY GENERAL OF THE )<br>STATE OF ILLINOIS, )<br>)<br>Respondents. ) | No. 20-cv-03809<br><br>Judge Andrea R. Wood |

## MEMORANDUM OPINION AND ORDER

Petitioner Reginald Jones, a prisoner in the custody of the Illinois Department of Corrections at Western Illinois Correctional Center, has brought this *pro se* habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his first-degree murder conviction from the Circuit Court of Cook County, Illinois. (Dkt. No. 1.) For the reasons stated below, the Court denies the petition on the merits and declines to issue a certificate of appealability.

### BACKGROUND

The Court draws the following factual history from the state court record (Dkt. No. 12) and the Illinois Appellate Court's decisions in Jones's direct appeal and post-conviction appeal.[1] *See People v. Jones*, 2013 IL App (1st) 113604-U ("*Direct Appeal*"); *People v. Jones*, 2019 IL App (1st) 152111-UB ("*Post-Conviction Appeal*").

---

[1] A state court's factual findings are presumed correct in a federal habeas corpus proceeding unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020); *Hall v. Zenk*, 692 F.3d 793, 805 (7th Cir. 2012). Jones has not rebutted the presumption.

I.     Jones's Trial

Following a jury trial, Jones was convicted of first-degree murder for the beating death of eighteen-year-old Douglas Haynes. (*Direct Appeal* ¶ 2.) The State's principal eyewitnesses were LaJarvis Franklin and Genard Rhodes—two friends of Haynes who were with him on the night he was beaten. (*Id*. ¶ 7.) According to Franklin and Rhodes, the incident occurred shortly before midnight on New Year's Eve. (*Id*. ¶¶ 9–10.) Haynes was driving various friends around the neighborhood while they decided how they were going to celebrate the holiday. (*Id.*; Dkt. No. 12-23 at 29–30.) The group stopped at a liquor store before making their way back towards where Haynes lived. (*Direct Appeal* ¶ 10.)

After they turned onto Haynes's street, they saw four men yelling and waving at Haynes to stop the van. (*Id*.) Franklin and Rhodes identified two of the men as Jones and Demetrius Shelton.[2] (*Id*.) They knew Jones from the neighborhood. (*Id*. ¶¶ 7–8.) Haynes stopped and let the men get in the van. (*Id*. ¶ 10.) Immediately upon entering, Shelton began to argue with Haynes. (*Id*.) The argument became physical, and Jones and Shelton started punching Haynes in the head. (*Id*.) Franklin attempted to intervene but he was held back by someone in the backseat. (*Id*.)

Haynes stopped the van in the middle of the street and fled to avoid the beating. (*Id*. ¶ 11.) But Jones and Shelton chased Haynes down the block. (*Id*.) Rhodes and the others followed behind and observed Shelton and Haynes begin to tussle before they both fell to the ground. (*Id*.) A crowd formed around the two and repeatedly kicked Haynes while he was on the ground. (*Id*.; Dkt. No.

---

[2] Jones, Shelton, and a third co-defendant, Terrence Hopkins, were tried by severed but simultaneous juries. (Dkt. No. 12-22 at 69–77.) The three juries were present in the courtroom for each co-defendant's cross-examination of the State's witnesses (Dkt. No. 12-23 at 4–5), and Jones's counsel adopted the cross-examinations of Dr. J. Lawrence Cogan by counsel for Shelton and Hopkins. (Dkt. No. 12-24 at 80.)

12-23 at 35.) Rhodes heard Haynes say he could not breathe and tried to step in, but he was told to stay away so he left the scene. (*Direct Appeal* ¶ 11.)

Like Rhodes, Franklin observed men standing around Haynes kicking him while he was on the ground. (*Id*. ¶ 12.) He also saw Jones and Shelton punching Haynes. (*Id*.) Franklin left the scene for a short time to drop off the alcohol he purchased at his girlfriend's house before returning to check on his friend. (*Id*. ¶¶ 12–13.) He saw Haynes standing alone in the street with blood on his face. (*Id*. ¶ 13.) He was no longer wearing the blue "Pele" jacket he had on earlier. (*Id*.; Dkt. No. 12-22 at 133.) Haynes attempted to walk down the street with Franklin but had difficulty seeing because of the blood dripping down his face. (*Direct Appeal* ¶ 13.) Franklin took the van to go get help and returned with Haynes's mother and sister. (*Id*.)

When Haynes's mother arrived, she saw her son lying on the ground. (*Id*. ¶ 14.) Haynes was crying and telling his mother he could not breathe, so they called an ambulance. (*Id*.) By the time the paramedics arrived, Haynes was unconscious, unresponsive, and gasping for air. (*Id*.) He was resuscitated at the scene before being brought to the hospital. (*Id*. ¶¶ 14, 18.) Haynes's mother would never have the opportunity to speak with her son again because he fell into a coma and remained unresponsive for the duration of his hospital stay. (*Id*. ¶ 14; Dkt. No. 12-22 at 108–09.)

Video surveillance footage obtained from a Police Observation Device ("POD") [3] corroborated Franklin's and Rhodes's accounts of the fight and was played for the jurors. (*Id.* ¶ 26.) The video shows the van stopped in the street and Haynes's jumping out of the driver's side

---

[3] PODs are video surveillance cameras mounted on city light poles in areas of Chicago that have high incidence of violent crime. POD cameras, which are monitored by the Chicago Police Department, have zoom and 360-degree rotation capabilities. The footage can be used to respond to crimes in progress, identify offenders, make arrests, and as evidence at trial. *Police Observation Device (POD) Cameras*, Chicago Police Department, *available at* https://home.chicagopolice.org/inside-cpd/police-observation-device-pod-cameras/ (last visited April 15, 2022).

3

with several other people also exiting the van. (*Id*.) Haynes is then seen on the ground with people standing around him, kicking and punching him. (*Id*.) The footage later shows Haynes sitting on the curb in the snow without his jacket. (*Id*.) Next, Franklin can be seen on the video with Haynes. (*Id*.) The video ends with people standing around Haynes and a fire truck and ambulance on the scene. (*Id*.)

The day after Haynes was admitted to the hospital, his sister saw Jones standing on a street corner while she was driving. (*Id*. ¶ 15.) As she approached the corner, she saw that Jones was wearing the same blue "Pele" jacket that her brother had been wearing on the night he was beaten. (*Id*.) When Jones noticed her staring, he pointed at her and laughed. (*Id*.)

Haynes remained in the hospital for the next several weeks before he died on January 18, 2008. (*Id*. ¶ 16.) Dr. J. Lawrence Cogan, a forensic pathologist from the Cook County Medical Examiner's Office, conducted Haynes's autopsy. (*Id*.) After receiving the assignment, Dr. Cogan reviewed Haynes's patient history and medical reports, which indicated he had been assaulted, developed rhabdomyolysis[4] in the hospital, and died. (*Id*. ¶ 17.) Dr. Cogan determined that the cause of Haynes's death was "pneumonia due to amphetamine intoxication with other significant conditions being multiple injuries due to an assault." (*Id*. ¶ 16.) He classified the manner of death as a homicide. (*Id*.)

At the time of his death, Haynes was obese (weighing approximately 335 pounds and standing at six feet, three inches tall) and suffered from a number of ailments, including "an enlarged heart that was dilated and 'flabby,' congestive heart failure, and a sickle cell trait." (*Id*.

---

[4] Rhabdomyolysis is a rare, life-threatening condition caused by muscle breakdown and muscle death as a result of overexertion, trauma, toxic substance, or disease. *Rhabdomyolysis*, Clevaland Clinic, *available at*: https://my.clevelandclinic.org/health/diseases/21184-rhabdomyolysis (last visited April 15, 2022).

¶ 6.) Given Haynes's pre-existing conditions, his cause of death was admittedly "complex." (*Id.* ¶ 16.) However, Dr. Cogan opined that the assault triggered the chain of events that ultimately led to Haynes's death. (*Id.*; Dkt. No. 12-24 at 43, 66.)

Dr. Cogan explained the sequence of events as follows:

During the assault, Haynes sustained injuries to the right side of his face, hands, and right leg. (*Id.* ¶ 21; Dkt. 12-24 at 54–55). Some of the injuries were made by a "blow," while others were made by a sharp object that may have had "two or more sharp edges." (*Id.* ¶ 21.) Dr. Cogan explained that some of the injuries on Jones's hands and forearm were consistent with defensive wounds. (Dkt. No. 12-14 at 53.) Haynes also suffered blunt force injuries to the head, which caused hemorrhaging under the scalp. (*Direct Appeal* ¶ 21; Dkt. No. 12-24 at 57–58.) Because of the head injuries, a device was surgically inserted into Haynes's brain to monitor for brain swelling. (*Id.*)

Following the assault, Haynes experienced shortness of breath. (*Direct Appeal* ¶ 18.) Because he had congestive heart failure, the assault put additional strain on his heart, which caused him to go into sudden cardiac arrest. (Dkt. No. 12-24 at 64–65.) He became unresponsive and collapsed at the scene of the crime. (*Direct Appeal* ¶ 18.)

When he arrived at the emergency room, Haynes was hypothermic. (Dkt. No. 12-24 at 65.) He had indications of the onset of renal failure, and his labored breathing required intubation. (*Direct Appeal* ¶ 18; Dkt. No. 12-24 at 42.) A urine test was completed and came back positive for amphetamines. (*Direct Appeal* ¶ 18.) Other than the positive urine test, there was no evidence that Haynes suffered from a drug overdose. (*Id.*)

Over the next few days, Haynes developed rhabdomyolysis, a serious condition that results in the destruction of the muscle. (*Id.* ¶ 19.) Dr. Cogan explained that rhabdomyolysis can be caused

5

by amphetamine use, as well as stress and exercise. (*Id*. ¶ 20.) After completing the autopsy, Dr. Cogan learned from Haynes's father that he had a sickle cell trait, which rendered him 200 times more likely to have exercise-induced rhabdomyolysis. (*Id*.) Given his weight and pre-existing conditions, Dr. Cogan believed even the short bout of running that Haynes did to try and escape the first attack could have caused the onset of rhabdomyolysis. (*Id*.; Dkt. No. 12-24 at 63.)

Once rhabdomyolysis destroyed Haynes's muscles, the remnants of the muscle blocked his kidneys, resulting in kidney failure. (*Id.;* Dkt. No. 12-24 at 42, 61.) After Haynes's kidneys failed, his liver failed. (*Id*.) And because he had to be intubated for such a long period of time, he developed pneumonia which led to sepsis and eventually Haynes's death. *Id.;* Dkt. No. 12-24 at 43.)

In sum, "the rhabdomyolysis began after the cardiac arrest, and because of these pre-existing conditions, heart failure, overweight, sickle cell trait, use of amphetamines, all these things set him up for the rhabdomyolysis which eventually killed him." (*Id.* ¶ 22.) While Dr. Cogan conceded that none of the cuts or injuries that Haynes sustained during the assault would have caused his death on their own (Dkt. No. 12-24 at 80–82), he opined that the assault triggered a chain-reaction of events that ultimately led to his death. (*Direct Appeal* ¶ 22.) In other words, but for the brutal attack, Haynes would not have died. (*Id.*)

After the State rested its case, Jones informed the court that he would not be testifying in his own defense and requested the jurors be instructed on the lesser offense of aggravated battery. (*Id*. ¶ 27.) The jury received instructions on first-degree murder, accountability, causation, and aggravated battery. (*Id*.) Following deliberations, the jury found Jones guilty of first-degree murder. (*Id*.) He was sentenced to 30 years in prison. (*Id*. ¶ 2.)

## II. Post-Trial Proceedings

Prior to sentencing, Jones fired his trial attorney. (*Id.* ¶ 29; Dkt. No. 12-24 at 233.) He filed a *pro se* motion to set aside the verdict, arguing that his actions did not cause nor contribute to Haynes's death. (*Direct Appeal* ¶ 29; Dkt. No. 12-14 at 138–48.) The trial court allowed Jones to obtain new counsel before ruling on the motion. (Dkt. No. 12-24 at 236.)

Jones's newly retained counsel filed a motion to set aside the verdict or for a new trial. (*Direct Appeal* ¶ 29; Dkt. No. 12-14 at 238–44.) The motion alleged that trial counsel was ineffective for failing to request a jury instruction on involuntary manslaughter and for failing to call an expert to contradict the medical examiner's testimony. (*Id.*) Jones attached an affidavit to the motion wherein he attested that his trial attorney never advised him of his right to request the lesser-included offense instruction of involuntary manslaughter. (Dkt. No. 12-14 at 245.) The motion also adopted Shelton's post-trial amended motion, which included a written report by forensic pathologist, Dr. Shaku Teas. (*Direct Appeal* ¶ 29; Dkt. No. 12-14 at 246–53.)

The trial court denied the attorneys' request for an evidentiary hearing on the two issues. (*Id.* ¶¶ 32, 34.) With respect to Dr. Teas's report, the trial court found that she and Dr. Cogan "reached almost the same conclusion" regarding Haynes's cause of death. (*Id.* ¶ 35.) As for the ineffective assistance claim, the trial court found there was no basis for counsel to request the instruction because no reasonable juror could have found the defendants acted in a reckless manner. (*Id.* ¶ 34.)

## III. Jones's Direct Appeal

On direct appeal, Jones reasserted his claim that his trial counsel was ineffective for failing to inform him of the possibility of requesting a jury instruction on involuntary manslaughter and

7

for failing to request such an instruction. (Dkt. No. 12-1 at 2–41.) The Illinois appellate court determined that trial counsel's representation was not deficient and affirmed Jones's convictions. (*Direct Appeal* ¶¶ 60–61.) Jones raised the same ineffective assistance argument in his petition for leave to appeal ("PLA") (Dkt. No. 12-5 at 2–22), which the Supreme Court of Illinois denied. *People v. Jones*, 8 N.E.3d 1051 (Ill. 2014).

### IV. Jones's Post-Conviction Proceedings

Jones dropped his ineffective assistance claim regarding the involuntary manslaughter instruction in his post-conviction petition, instead arguing his trial counsel was ineffective for failing to call medical witnesses to rebut Dr. Cogan's conclusions. (*Post-Conviction Appeal* ¶ 18.) The post-conviction trial court summarily dismissed his petition. (*Id.* ¶ 19.) On appeal, Jones argued that the trial court erred in denying his motion for discovery to substantiate the claims in his post-conviction petition and that he did not receive reasonable assistance from post-conviction counsel. (*Id.* ¶¶ 23, 30.) The Illinois Appellate Court rejected both claims (*id.* at 41),[5] and the Supreme Court of Illinois denied Jones's PLA, which raised the same two arguments presented on post-conviction appeal. *People v. Jones*, 132 N.E.3d 325 (Ill. 2019).

## DISCUSSION

Jones raises a single claim in his *pro se* § 2254 petition: trial counsel was ineffective for failing to request an involuntary manslaughter instruction.[6] The Illinois Appellate Court denied

---

[5] The Illinois Appellate Court first affirmed the trial court's summary dismissal in 2018. *People v. Jones*, 2018 IL App (1st) 152111-U, ¶ 1, *appeal denied, judgment vacated*, 116 N.E.3d 931 (Ill. 2019). The 2018 post-conviction appellate court decision was later vacated at the direction of the Supreme Court of Illinois, in light of new case law regarding reasonable assistance of post-conviction counsel. *See People v. Jones*, 116 N.E.3d 931 (Ill. 2019). The Illinois Appellate Court issued a new decision in 2019, once again affirming the judgment of the post-conviction trial court.

[6] Subsequent to filing his § 2254 petition, Jones retained counsel. Counsel did not seek leave to amend the

Jones's ineffective assistance claim on the merits on direct appeal. (*See Direct Appeal* ¶¶ 41–63.) This Court's review of the appellate court's decision is thus governed by § 2254(d)'s deferential standard of review. *See* 28 U.S.C. § 2254(d); *see also Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012).

I. **Standard of Review Under § 2254**

Federal habeas relief may not be granted for claims subject to § 2254(d) unless the petitioner demonstrates the state court's decision was either "contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States," or the state court decision was based upon "an unreasonable determination of facts" in light of the evidence before it. 28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This is a "highly deferential standard for evaluating state-court rulings" that is "difficult to meet" and "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotations and citations omitted).

A state court's decision is "contrary to" clearly established federal law if it used the wrong legal standard or if it "reached a result opposite to that reached by the Supreme Court on materially indistinguishable facts." *Virsnieks v. Smith*, 521 F.3d 707, 713 (7th Cir. 2008) (citing *Williams*, 529 U.S. at 405; *Jackson v. Miller*, 260 F.3d 769, 774 (7th Cir. 2001)). An "unreasonable application" occurs when the state court identifies the correct legal principle but unreasonably applies it to the facts of the case, thereby resulting in a decision that is more than simply incorrect, but objectively unreasonable. *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations

---

*pro se* petition, but rather appeared in the case to file Jones's reply to Respondent's response brief. (Dkt. No. 14.)

and citations omitted). The state court's application of federal law must be so erroneous that it lies "well outside the boundaries of permissible differences of opinion." *Collins v. Gaetz*, 612 F.3d 574, 585 (7th Cir. 2010) (internal quotations and citations omitted).

## II. Jones's *Strickland* Claim Is Meritless

To establish ineffective assistance of counsel, *Strickland* requires Jones to demonstrate both deficient performance and prejudice. 466 U.S. at 688; *see also Premo v. Moore*, 562 U.S. 115, 121 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). In considering the performance prong, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. As to the prejudice prong, Jones must show a substantial likelihood the result of the proceeding would have been different but for counsel's performance. *Harrington*, 562 U.S. at 111–12. Review of the Illinois Appellate Court's decision is thus "doubly deferential," as the Court must apply the highly "deferential lens of § 2254(d)" to *Strickland*'s highly deferential standard for reviewing counsel's performance. *Cullen*, 563 U.S. at 190.

Jones does not advance an argument that the direct appeal appellate court's decision was "contrary to" Supreme Court precedent, and any potential argument would be meritless as the state court properly identified and applied the controlling *Strickland* standard. (*See Direct Appeal* ¶¶ 44–45.) Additionally, he cannot show the state court's rejection of his *Strickland* claim is objectively unreasonable.

### A. Jones Cannot Obtain Relief on his *Strickland* Claim Because He Is Challenging a State Law Ruling

Jones's *Strickland* claim fails because he is challenging the state court's interpretation of Illinois's involuntary manslaughter instruction. The Illinois Appellate Court's interpretation of

10

Illinois law is binding on this Court. *See Miller v. Zatecky*, 820 F.3d 275, 277 (7th Cir. 2016); *see also Cole v. Nicholson*, No. 1:18-CV-02378, 2020 WL 3958717, at *5 (N.D. Ill. July 13, 2020); *Stevens v. Butler*, No. 15-CV-03523, 2020 WL 3618684, at *4 (N.D. Ill. July 2, 2020) ("[E]ven though [the petitioner] is raising a *Strickland* claim, the Court is bound by the state court's ruling with respect to its own state law within the *Strickland* analysis."). Given that the evidence did not warrant an involuntary manslaughter instruction, it follows that Jones could not establish deficient performance based on counsel's failure to request the instruction. *See Lopez v. Thurmer*, 594 F.3d 584, 587 (7th Cir. 2010) ("It is not well outside the boundaries of permissible differences of opinion to conclude that counsel's performance is constitutionally adequate when he fails to request an instruction that, as a matter of state law, the defendant is not entitled to in the first place."). It was therefore reasonable for the state appellate court to reject Jones's ineffective assistance claim. *Harper v. Brown*, 865 F.3d 857, 859 (7th Cir. 2017) ("[H]is argument is really an attack on the state court's resolution of a question of state law embedded within its analysis of *Strickland*'s claim. Federal courts are not empowered to review questions of state law under § 2254.").

Relatedly, Jones argues that the state appellate court's conclusion that he was ineligible for an involuntary manslaughter instruction is predicated upon an unreasonable determination of fact allowing for federal habeas corpus relief under 28 U.S.C. § 2254(d)(2). (Dkt. No. 1 at 10; Dkt. No. 14 at 9–12.) His view is that his conduct qualified him for the involuntary manslaughter instruction under Illinois law, and the state court's conclusion to the contrary is predicated upon an unreasonable determination of fact. Jones's argument, however, is barred by the guidance in *Wilson v. Corcoran*, 562 U.S. 1, 6 (2010) (per curiam), that § 2254(d)(2) "does not repeal the

11

command of § 2254(a) that habeas relief may be afforded to a state prisoner 'only on the ground' that his custody violates federal law." Jones's § 2254(d)(2) argument is a rebranding of his underlying argument that the state court's application of Illinois law is in error, but this Court has no license to reexamine a state court's ruling on a question of state law even within the context of a *Strickland* claim. *Harper*, 865 F.3d at 859.

Jones further argues that he wanted to raise the involuntary manslaughter instruction at trial, but his lawyer was allegedly deficient by failing to consult him on the decision. (Dkt. No. 1 at 9; Dkt. No. 15 at 5.) This argument runs into the major principle of this case that Jones had no right to an involuntary manslaughter instruction, and so any alleged failure by his attorney to discuss the instruction with Jones and request it in state court is irrelevant.

In sum, this Court has no authority to overturn a state court's determination on its own state law. As such, Jones had no right to the involuntary manslaughter instruction, and thus his trial counsel was not deficient for failing to make a meritless request. *See Carrion v. Butler*, 835 F.3d 764, 778–79 (7th Cir. 2016). The state court's rejection of Jones's claim is neither contrary to, nor an unreasonable application of, *Strickland*.

### B. Jones's Remaining Arguments Are Unavailing

Jones also invokes *Crace v. Herzog*, 798 F.3d 840 (9th Cir. 2015), claiming that "Crace [] is exactly like my case." (Dkt. No. 1 at 11.) It is true that the prisoner in *Crace,* like Jones in this case, alleged that his trial counsel was ineffective for failing to seek a jury instruction on a lesser-included offense at trial. But that is where the similarity ends.

In *Crace*, the Ninth Circuit held that the state court erred in performing the *Strickland* prejudice analysis by presuming that the jury would have found the prisoner guilty if it had been

12

instructed on the lesser-included offense because it had found the prisoner guilty of the more serious offense. 798 F.3d at 843. *Crace* held that the analysis conflicted with the *Strickland* prejudice standard. *Id.* at 847.

The state appellate court, however, did not reach the prejudice prong, instead resolving Jones's claim on the grounds that Illinois law did not allow him to seek the lesser-included offense instruction, and thus, trial counsel could not be faulted for failing to make that argument. (*Direct Appeal* ¶¶ 39–60.) This argument, like all Jones's arguments, goes back to the singular belief that the state court erred in finding that he did not qualify for the lesser-included offense instruction. As previously stated, this Court has no license to reexamine that determination, even via the instant *Strickland* claim. *Crace* is an example of where a state court erred by conflating two standards (*Strickland*'s prejudice prong and sufficiency of the evidence). Jones believes that the appellate court in his case also conflated standards and misapplied evidence, but he is arguing it within the context of the unreviewable state law issue.

Even if the Court had the authority to review the state court's adjudication on the state law question, it would agree with the state court's conclusion that the "record amply establishes that [Jones] acted deliberately and intentionally by brutally attacking and beating [the victim]." (*Direct Appeal* ¶ 51.) The state court concluded that Jones's actions qualified as murder because his acts resulted in the victim's death without lawful justification, and he knew his acts "create[d] a strong probability of death or great bodily harm." (*Id*. ¶ 47 (citing 720 ILCS 5/9-1(a)(2)).) In contrast, involuntary manslaughter is committed when the assailant kills his victim while performing acts that are "likely to cause death or great bodily harm to some individual, and he performs them recklessly." (*Id*. (citing 720 ILCS 5/9-3(a)).) Factors to consider for the involuntary manslaughter

13

instruction include: (1) the disparity in size and strength between the defendant and the victim . . . ; (2) the brutality and duration of the beating…; and (3) whether a defendant used his bare fists or a weapon, such as a gun or a knife." (*Id*. ¶ 50 (citing *People v. DiVincenzo*, 700 N.E.2d 981, 987–88 (Ill. 1998), *abrogated on other grounds by People v. McDonald*, 77 N.E.3d 26 (Ill. 2016)).) Equally relevant is whether the nature of the killing demonstrated Jones did not act recklessly. (*Id*.)

There was nothing reckless about Jones's actions in this case. As the state court recognized, he and the other assailants brutally murdered the victim. The evidence shows that the offenders, including Jones:

- flagged down Haynes's van waiving and yelling at him as he drove by;

- started attacking Haynes as soon as he let them in his van;

- held Franklin back as he tried to help Haynes;

- chased after Haynes after he stopped and fled from the van;

- were able to get Haynes to the ground where they repeatedly kicked, punched, and used a sharp weapon to beat him, causing injuries to his hands and face as well as brain hemorrhages;

- outnumbered Haynes and were bigger and stronger than him when attacking him;

- continued to beat Haynes even after he said he could not breathe and told Rhodes not to intervene; and

- made Haynes defenseless to the point that they were able to remove his jacket from his large frame and left him on the street bleeding and gasping for air.

Shortly after the offenders fled, Haynes experienced shortness of breath, collapsed, and became unresponsive. He remained in that state until his death. The state court determination on

14

the state law issue is not before this Court; but even if it were, the Court would wholeheartedly agree with the state court's conclusion.

### C. Jones Cannot Demonstrate Prejudice Under *Strickland*

For sake of argument, even if Jones were entitled to an instruction on involuntary manslaughter, he could not satisfy *Strickland*'s prejudice prong. Jones contends that there is a reasonable probability the jury would have convicted him of involuntary manslaughter instead of first-degree murder because Haynes was able to walk and talk after they beat him, and a reasonable person would not know that kicking and hitting someone would create a strong probability of death or great bodily harm. (Dkt. No. 1 at 11; Dkt. No. 14 at 7–9.)

The jurors, however, heard testimony of two individuals present during the attack and observed the events unfold on the POD video. As discussed above, the evidence showed that this was not a harmless fight as Jones suggests; rather it was a ruthless, targeted beating that killed a defenseless victim. Haynes tried to escape the attack and his friends tried to intervene, but Jones and the other offenders were relentless and continued to beat Haynes to the point that he lost consciousness before the paramedics even arrived on scene. Additionally, as the state court explained, the victim's pre-existing conditions were not relevant to determine Jones's mental state at the time of the attack because he took Haynes as he found him that evening. (*Direct Appeal* ¶ 59); *see also United States v. Mitchell*, 353 F.3d 552, 562 (7th Cir. 2003) ("The criminal offender takes his victim as he finds him."). Jones therefore cannot demonstrate prejudice under *Strickland* in addition to being unable to show deficient performance.

For all these reasons, Jones's *Strickland* claim is meritless. Accordingly, his habeas corpus petition is denied on the merits.

### III. Jones's Request for an Evidentiary Hearing

Jones requests an evidentiary hearing on his ineffective assistance claim because his counsel has not testified regarding his trial strategy and decision to not request an involuntary manslaughter instruction. (Dkt. No. 14 at 12) The availability of evidentiary hearings is limited to the narrow exception where the petition has "(1) [] alleged facts which, if proved, would entitle him to habeas relief and (2) the state courts, for reasons beyond his control, never considered his claim in a full and fair hearing." *Ward v. Jenkins,* 613 F.3d 692, 698 (7th Cir. 2010) (citations omitted). Here, too, the highly deferential standards prescribed by § 2254 govern the Court's consideration. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). The Court is not required to hold an evidentiary hearing where the record refutes the petitioner's factual allegations or otherwise precludes habeas relief. *Id.*

Jones is not entitled to federal habeas relief for his claim that counsel was ineffective in failing to request the lesser offense instruction of involuntary manslaughter. The state court's rejection of his claim was neither contrary to, nor an unreasonable application of, *Strickland*. Accordingly, Jones is not entitled to an evidentiary hearing. *See Mulero v. Thompson*, 751 F. Supp 1009, 1028 (N.D. Ill. 2010), *aff'd*, 668 F.3d 529 (7th Cir. 2012).

### IV. Certificate of Appealability and Notice of Appeal Rights

Jones is advised that this is a final decision ending his case in this Court. If he wishes to appeal, he must file a notice of appeal with this Court within 30 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Jones need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if he wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed

within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

Furthermore, the Court declines to issue a certificate of appealability. A certificate of appealability "may not issue 'unless the applicant has made a substantial showing of the denial of a constitutional right.'" *Slack v. McDaniel*, 529 U.S. 473, 483 (2000) (quoting 28 U.S.C. § 2253(c)). This requires a showing that reasonable jurists could debate whether this Court should have resolved Jones claims differently or that the issues were "adequate to deserve encouragement to proceed further." *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing *Slack*, 529 U.S. at 484) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Jones cannot meet this standard.

## CONCLUSION

Jones's habeas corpus petition is thus denied on the merits. Any other pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to: (1) terminate Respondents Alex Jones and the Attorney General of the State of Illinois; (2) add Jones's current custodian, Brittany Greene, Warden, Western Illinois Correctional Center as Respondent; (3) alter the case caption to *Jones v. Greene*; and (4) enter a judgment in favor of Respondent. Civil Case Terminated.

ENTERED:

Dated: April 19, 2022

ANDREA R. WOOD
United States District Judge